# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JANE DOE, as Mother and Next    :
Friend of M.W., a minor,    :
   :
     Plaintiff,    :
   :    CIVIL ACTION NO.
   v.    :    1:15-CV-03276-RWS
   :
DEKALB COUNTY SCHOOL    :
DISTRICT and RODNEY    :
WINSTON,    :
   :
     Defendants.    :

## ORDER

This case comes before the Court on Defendant DeKalb County School

District's Motion for Summary Judgment [66].  After reviewing the record, the

Court enters the following Order.

## Background[1]

This suit arises out of Defendant Rodney Winston's inappropriate

---

[1] In reviewing a grant of summary judgment, the Court is required to view the facts in the light most favorable to the nonmoving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). Therefore, the facts are set forth in the light most favorable to the Plaintiff.

conduct at Lithonia Middle School ("LMS") and the DeKalb County School District's ("DCSD") handling of his misconduct.

Plaintiff Jane Doe brings this suit on behalf of minor M.W., against DCSD and Rodney Winston, formerly a custodian at Lithonia Middle School, as Defendants. (Am. Compl., Dkt. [15].) DCSD employed Mr. Winston as a custodian at LMS from December 2010 to October 2014. (Def. DCSD's SMF, Dkt. [66-3], ¶¶ 24, 153.) During his employment, the school received at least four separate allegations that Mr. Winston acted inappropriately towards students. (Def. DCSD's SMF, Dkt. [66-3], ¶¶ 63, 87, 128, 131.) This suit specifically concerns M.W.'s sexual harassment allegation against Mr. Winston, but the other allegations and DCSD's handling of those incidents are also relevant to Plaintiff's claims.

The Previous Allegations

The first allegation against Mr. Winston came in 2011 when a student, hereafter referred to as Jane Doe I, claimed Mr. Winston acted inappropriately towards her. (Id. ¶ 63.) In two written statements, Jane Doe I specifically complained that he acted "like a pervert" by throwing candy at her buttocks, asking her "weird questions," trying to give her money, and repeatedly staring

at her in a manner that made her uncomfortable. (Id. ¶¶ 63-64, 68.)

Upon notification of the allegations, LMS principal Lisa McGhee followed DCSD protocol by conducting an investigation, notifying the social worker, and ultimately submitting an employee misconduct packet to then regional superintendent,[2] Horace Dunson, after concluding that Mr. Winston had engaged in inappropriate conduct of a sexual nature with a student. (Id. ¶¶ 65-73, 76-78; Pl.'s SMF, Dkt. [72] ¶ 10.) During the course of McGhee's investigation, Mr. Winston again made Jane Doe I feel uncomfortable, after McGhee directed him to have no further contact with the student. (Def. DCSD's SMF, Dkt. [66-3], ¶¶ 72, 74; Pl.'s SMF, Dkt. [72] ¶¶ 11-14.) This incident was included in McGhee's report to the Regional Superintendent, along with her recommendation that Mr. Winston receive "several days of staff time out." (Def. DCSD's SMF, Dkt. [66-3], ¶ 78; Pl.'s SMF, Dkt. [72] ¶ 15, 16.)

The Regional Superintendent then reported the employee misconduct to DCSD's Office of Legal Affairs ("OLA"), who reported it to the

---

[2] The Court notes that at the time Horace Dunson's title was "Area Assistant Supervisor," and that the same role is now called "Regional Superintendent." For the sake of clarity, the Court uses the title "Regional Superintendent" throughout.

Superintendent, along with a recommendation that Mr. Winston be issued a letter of reprimand and reassigned to a work shift "that does not bring him into contact with students." (Def. DCSD's SMF, Dkt. [66-3], ¶¶ 79, 80, 82.) Mr. Winston's shift was changed to avoid student contact, and he was issued a written letter of reprimand with the following language:

> On or about September 28, 2011, it was reported that you acted unprofessionally by throwing a piece of candy at the posterior of a female student. As a result of the investigation, you are hereby **REPRIMANDED AND PROHIBITED FROM HAVING ANY INAPPROPRIATE COMMUNICATION WITH STUDENTS**. Please be advised that further violations of this nature will result in termination of your employment.

(Carson Depo., Dkt. [80] Ex. 34 (emphasis in original).) Principal McGhee did not receive a copy of the letter. (Def. DCSD's SMF, Dkt. [66-3], ¶¶ 83, 86; Pl.'s SMF, Dkt. [72] ¶ 18.)

The second allegation against Defendant Winston came in 2013 when another student, hereafter referred to as Jane Doe II, claimed Mr. Winston acted inappropriately towards her. (Def. DCSD's SMF, Dkt. [66-3], ¶ 87.) In a

4

written statement, Jane Doe II specifically complained about the following remarks and actions by Mr. Winston: (1) he referred to her as his "queen" and his "princess"; (2) he remarked to her "I like how you have a phone but don't call or text me;" (3) he approached her and said "I was waiting on my call last night;" (4) he hugged her; (5) he said to her "damn girl, I spotted you from down the hall." (Id. ¶ 88.) She further complained to faculty that Mr. Winston's behavior made her "emotionally stressed" and that she was at her "breaking point." (Pl.'s SMF, Dkt. [72] ¶ 21.)

Upon notification of the allegations, Principal McGhee again followed DCSD protocol by conducting an investigation, notifying the social worker, and ultimately submitting an employee misconduct packet to then regional superintendent, Angela Pringle. (Def. DCSD's SMF, Dkt. [66-3], ¶¶ 89-91, 93-94.) In the employee misconduct packet, Principal McGhee pointed out that this was the "second time" allegations of inappropriate conduct had been made against Mr. Winston and noted that he is "continuously accused of inappropriate behavior." (Pl.'s SMF, Dkt. [72] ¶ 25.) She recommended "internal transfer from Lithonia Middle School." (Id. ¶ 26.)

Unlike the 2011 incident, in 2013, the Regional Superintendent did not

report the incident to the OLA. (Def. DCSD's SMF, Dkt. [66-3], ¶ 95.)

Therefore, neither the OLA, nor the Superintendent knew about the incidents

involving Jane Doe II. (Pl.'s SMF, Dkt. [72] ¶ 28.) Under DCSD's

management structure, the Regional Superintendent and the Principal lack

authority to terminate an employee. (Def. DCSD's SMF, Dkt. [66-3], ¶ 36.) If

the OLA had been informed of the 2013 incident, Winston would have been

terminated. (Pl.'s SMF, Dkt. [72] ¶ 30.)

Instead, Mr. Winston was directed in writing and in a meeting with

Principal McGhee not to have "contact with [Jane Doe II]." (Def. DCSD's

SMF, Dkt. [66-3] ¶ 99; Pl.'s SMF, Dkt. [72] ¶ 27.) Further, his schedule was

again modified to avoid student contact, which included having him begin each

shift in the cafeteria. (Def. DCSD's SMF, Dkt. [66-3] ¶ 98.) Of note, while he

was cleaning the cafeteria, the sixth-grade students would pass by during a

class transition. (Id.)

<u>The Summer Incident</u>

During the summer of 2014, Mr. Winston sexually assaulted M.W.[3] (Id.

---

[3] While Plaintiff's Amended Complaint [15] alleged two incidents of sexual
assault by Mr. Winston on M.W., Defendant DCSD details one assault in its Statement
of Facts, and Plaintiff admits those paragraphs. (Def. DCSD's SMF, Dkt. [66-3] ¶¶

6

at 19-21.)  The assault occurred at the home of Mr. Winston's aunt, off school

grounds and before M.W. began as a student at LMS. (Id.)  That summer, Mr.

Winston's aunt, niece, and nephew lived in a house on the same street as M.W.

(Id.)  M.W. was regularly at Mr. Winston's aunt's house playing with his niece

and nephew.  (Id.)  Similarly, Mr. Winston was often at his aunt's house, while

also spending time in the neighborhood and occasionally stopping by M.W.'s

house to visit her brother. (Id.)

   The day of the assault, M.W. went to Mr. Winston's aunt's house with

one of his nephews.  (Id. ¶ 109.)  At the house, Mr. Winston approached M.W.

with a $20.00 bill and proceeded to stick his hands down the front of her pants.

(Id. ¶¶ 110-111.)  M.W. fled, running back to her house.  (Id. ¶ 112.)  But Mr.

Winston followed her, even knocking on the door and shaking the doorknob

when she would not answer.  (Id. ¶ 113.)  M.W. did not immediately tell

anyone about the incident, though she eventually told her friend A.S. after A.S.

confided in M.W. that Mr. Winston also touched her inappropriately.  (Id. ¶¶

115-116.)

---

114-116; Pl's. Resp. to Def DCSD's SMF, Dkt. [71] ¶¶ 114-116.)  The Court will
therefore proceed with the understanding that there was one assault, occurring in July
2014.

AO 72A
(Rev.8/82)

<u>The School Year Allegations</u>

In August 2014, M.W. started sixth grade at Lithonia Middle School, where Mr. Winston was employed by DCSD as a custodian. (<u>Id.</u> ¶ 117.) From then until October 2014, M.W. saw Mr. Winston every day at school. (<u>Id.</u> ¶ 118; Pl.'s SMF, Dkt. [72] ¶ 1.) Specifically, M.W. had to walk past the cafeteria every day during her scheduled class change. (Def. DCSD's SMF, Dkt. [66-3] ¶ 118.) And each day, M.W. would see Mr. Winston standing by the cafeteria, as if he were "stalking" her. (Pl.'s SMF, Dkt. [72] ¶ 2.) Sometimes, Winston tried to get M.W.'s attention by saying "hi" or "hey" as she walked by. (Def. DCSD's SMF, Dkt. [66-3] ¶ 123.) Those encounters "made M.W. very uncomfortable and caused M.W. to fear for her safety while at school," which resulted in her not wanting to go to school. (Pl.'s SMF, Dkt. [72] ¶¶ 4-6.)

In October 2014, M.W.'s friend A.S., also a minor, told A.S.'s mother and aunt that Mr. Winston had "touched her inappropriately" and that Mr. Winston had done the same thing to M.W. (Def. DCSD's SMF, Dkt. [66-3] ¶ 126.) A.S.'s mother called Plaintiff, who then spoke with M.W. M.W. then told Plaintiff about the July 2014 incident (<u>Id.</u> ¶ 127.) Plaintiff then contacted

8

Principal McGhee and reported the incident. (Id. ¶ 128.) A.S.'s mother also reported that Mr. Winston had inappropriately touched A.S. (Id. ¶ 131.)

Following those reports, Principal McGhee again conducted an investigation into the alleged incidents and submitted an employee misconduct packet to then regional superintendent, Kenneth Bradshaw. (Id. ¶¶ 132-140, 145.) This time, in the employee misconduct packet, Principal McGhee recommended termination. (Id. ¶ 146.) Further, this time the regional superintendent reported the incident to the OLA. (Id. ¶¶ 150-152.) Mr. Winston was allowed to resign in lieu of termination on October 21, 2014. (Id. ¶ 153.) Warrants were issued for Mr. Winston's arrest and he pled guilty to the charges against him. (Id. ¶ 159; Am. Compl., Dkt. [15] ¶¶ 30–31.)

After his resignation, the DCSD Department of Public Safety (DPS) conducted a criminal background check on Mr. Winston. (Id. ¶ 156.) This check revealed a 2001 charge for child molestation against Mr. Winston that was discharged under Georgia's First Offender Act and did not appear on his prospective employee background check. (Id. ¶ 4, 12, 158.) If the 2001 charge had appeared on his prospective employee background check, Winston would have been automatically disqualified as an applicant. (Id. ¶¶ 6, 22.)

9

Of Plaintiff's fourteen original claims, only two causes of actions remain: (1) Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, ("Title IX") against DCSD; and (2) 42 U.S.C. § 1983 ("Section 1983") against DCSD and Mr. Winston. In addition, Plaintiff seeks punitive damages and attorney's fees.  DCSD filed its Motion for Summary Judgment [66] on August 6, 2018.

## Discussion

## I.    Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes

such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But the court is bound only to draw those inferences that are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary

11

judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II. Analysis

### A. Plaintiff's Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied right of action for money damages in Title IX cases and has held that a teacher's sexual harassment of a student ("teacher-student harassment") constitutes actionable discrimination under Title IX. <u>Franklin v. Gwinnett County Pub. Schs.</u>, 503 U.S. 60, 75–76 (1992). Plaintiff alleges that M.W. was sexually harassed by Mr. Winston and that DCSD is liable for damages under Title IX for failing to prevent such harassment.

Because Plaintiff's claim involves teacher-student sexual harassment the Court's analysis is governed by the Supreme Court's decision in <u>Gebser v.</u>

12

Lago Vista Independent School District, 524 U.S. 274 (1998). The Supreme Court held in Gebser that a school district will not be liable in damages under Title IX for teacher-student sexual harassment "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." 524 U.S. at 277. Deliberate indifference is defined by the Supreme Court as "an official decision by the recipient [of federal funds] not to remedy the violation." Id. at 290.

Thus, to survive summary judgment, Plaintiff must establish that a reasonable jury could conclude two things: "(1) a school district official with the authority to take corrective measures had actual notice of the harassment; and (2) the official with such notice was deliberately indifferent to the misconduct." Sauls v. Pierce Cty. Sch. Dist., 399 F.3d 1279, 1284 (11th Cir. 2005); Anderson, 477 U.S. at 257. DCSD contends Plaintiff has not met this burden. The Court disagrees.

DCSD first argues that Title IX does not apply at all because M.W. was not discriminated against on the basis of sex. Specifically, DCSD maintains that Mr. Winston's actions on campus toward M.W. were not enough to

AO 72A
(Rev.8/82)

establish sex-based discrimination or harassment. In support, DCSD cites a slew of cases from this circuit where courts found that specific conduct did not amount to discrimination on the basis of sex. (Def. DCSD's MSJ, Dkt. [66-1] at 6-7.) Nevertheless, these cases do not advance Defendant's argument because they concern student-student, not teacher-student, sexual harassment. The Supreme Court made a clear distinction between the two, applying a more rigorous standard when a Title IX plaintiff seeks damages against a school district for student-student harassment. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 650-53 (1999).

Unlike student-student, teacher-student harassment plaintiffs need not establish that the conduct was severe and pervasive. Sauls, 399 F.3d at 1284. Instead, whether gender-oriented conduct rises to the level of actionable harassment in Title IX cases "'depends on a constellation of surrounding circumstances, expectations, and relationships,'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998), including, but not limited to, "the ages of the harasser and the victim and the number of individuals involved." Davis, 526 U.S. at 651 (parallel citation omitted). Therefore, the relevant inquiry is whether a reasonable jury could find that Mr. Winston's

AO 72A
(Rev.8/82)

behavior at school towards M.W. was sexual harassment under the circumstances. The Court finds that it could.

On their face, Mr. Winston's friendly "hi" and "hey" comments to M.W. appear innocuous, and his daily position by the cafeteria, merely his required post. But, in the context of Mr. Winston's prior sexual assault of M.W., these facts could constitute sexual harassment. To begin, M.W. was an eleven year old girl, while Mr. Winston was a grown adult; a grown adult who assaulted M.W. shortly before she began her sixth grade year at a brand new school. Mr. Winston worked at that school, and M.W. walked by Mr. Winston cleaning the cafeteria daily.

Mr. Winston could have ignored M.W. In fact, he was instructed to refrain from any interaction with students. Instead, he attempted to engage M.W. by speaking to her and, according to Plaintiff, waiting for her outside the cafeteria as if he were stalking her. This went on for months. M.W. could not avoid Mr. Winston. She walked by the cafeteria with her class during a formal class transition. Given this context, a jury could conclude that Mr. Winston, a person with age and authority over M.W., sexually harassed her at school.

DCSD further argues that even if there was sexual harassment, Plaintiff's

Title IX claim should be dismissed because DCSD did not act with deliberate indifference.[4] Plaintiff points to several allegedly deliberately indifferent decisions DCSD made regarding the 2013 incident. "Deliberate indifference is an exacting standard; school administrators will only be deemed deliberately indifferent if their 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" Doe v. Sch. Bd. of Broward Cty., Fla., 604 F.3d 1248, 1259 (11th Cir. 2010) (citing Davis, 526 U.S. at 648). Both parties rely on the Eleventh Circuit's decision in Broward to support their position. The Court has reviewed Broward, along with other authorities. Based upon this review, the Court concludes that Plaintiff has raised a material issue of fact as to whether DCSD was deliberately indifferent to Winston's alleged sexual misconduct, subjecting M.W. to harassment. Id. at 1260.

As the Eleventh Circuit acknowledged on similar facts in Broward, if we were examining DCSD's response to M.W.'s allegations alone, it would be difficult to deem their response "clearly unreasonable in light of the known circumstances." That said, the undisputed fact that two prior female students

_____

[4] The parties agree that an appropriate person had actual notice of Defendant Winston's misconduct. Therefore, the Court moves directly to the deliberate indifference analysis.

AO 72A
(Rev.8/82)

accused Winston of sexual harassment raises a sufficient fact issue of deliberate indifference at the summary judgment stage because "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior." Id. at 1261 (adopting the Sixth Circuit's view on deliberate indifference).

While DCSD responded to every complaint against Winston, a school cannot shield itself from Title IX liability simply by taking *some* action to investigate sexual harassment allegations. See id. at 1260, 1262. Instead, the inquiry is contextual, requiring schools to respond in a manner that is not "clearly unreasonable in light of the known circumstances." Id. Here, a reasonable jury could conclude that Principal McGhee's failure to recommend termination after the second allegation against Winston in 2013, the Regional Superintendent's failure to report the incident to the OLA, and the Regional Superintendent's failure to accept Principal McGhee's recommendation to transfer Winston were "clearly unreasonable in light of the known circumstances," and caused M.W.'s alleged sexual harassment by "substantially increas[ing] the risk faced by female students" at LMS. Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282, 1296 (11th Cir.2007). For that reason, the Court **DENIES** DCSD's Motion

for Summary Judgment [66-1] as to Plaintiff's Title IX claim.

B.    Plaintiff's Section 1983 Claim

To establish liability under 42 U.S.C. § 1983 ("Section 1983"), a plaintiff must assert the violation of a specific constitutional right committed by someone acting under color of state law.  Broward, 604 F.3d at 1265 (citing Williams, 477 F.3d at 1299).  Here, Plaintiff alleges that DCSD violated her rights under the Equal Protection Clause of the Fourteenth Amendment.  In response, DCSD maintains that, as a municipal entity, it cannot be held liable for the acts of its employees because, as a matter of law, Plaintiff has not established municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).  The Court agrees.

The Supreme Court "has placed strict limitations on municipal liability under [Section] 1983."  Grech v. Clayton Cty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003).  As a municipal entity, DCSD cannot be held liable under Section 1983 for the acts of its employees based on a theory of *respondeat superior*. See Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir.1997) (citing Monell, 436 U.S. 658 (1978)).  Instead, to impose Section 1983 liability on a municipality, a plaintiff must identify a municipal policy or custom that caused

18

her injuries. See Gomez v. Lozano, 759 F.Supp.2d 1335, 1338 (S.D.Fla.2011).

A court may hold the municipality liable "only if its custom or policy caused

the municipal 'employees to violate a citizen's constitutional rights.' " Id.

(quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir.1998)).

There are three ways Plaintiff can establish municipal liability: (1)

identify an official policy; (2) identify an unofficial custom or practice that is

"is so permanent and well settled as to constitute a custom and usage with the

force of law;" or (3) identify a municipal official with final policymaking

authority whose decision violated the plaintiff's constitutional rights. See

Cuesta v. Sch. Bd. of Miami-Dade Cty., Fla., 285 F.3d 962, 966, 968 (11th Cir.

2002). Here, Plaintiff advances arguments for the second and third theories of

Monell liability. The Court will address each in turn.

*1.     Unofficial Custom or Practice*

Plaintiff alleges that DCSD violated M.W.'s rights under the Equal

Protection Clause through customs or practices that, though unwritten, have the

force of law. First, Plaintiff claims DCSD had a custom or practice of not

informing the regional superintendent or principal of employee reprimands.

Second, Plaintiff alleges a DCSD custom or practice of allowing regional

19

superintendents to retain their own files, even as they regularly rotated in their

positions.  Essentially, Plaintiff argues that either of these customs or practices

could impose <u>Monell</u> liability because it systematically kept decision-makers

from having necessary information to handle employee misconduct allegations,

such as the allegations against Mr. Winston.  DCSD, in turn, argues neither of

these are customs or practices under the <u>Monell</u> standard.

To prove Section 1983 liability against a municipality based on custom a

plaintiff must evidence a widespread practice that, "although not authorized by

written law or express municipal policy, is so permanent and well settled as to

constitute a 'custom or usage with the force of law," <u>St. Louis v. Praprotnik</u>,

485 U.S. 112, 127  (internal quotations omitted).  In cases alleging municipal

"inaction," a municipality's failure to correct the constitutionally offensive

actions of its employees can rise to the level of a custom or policy "if the

municipality tacitly authorizes these actions or displays deliberate indifference"

towards the misconduct.  <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1308

(11th Cir. 2001).

Here, Plaintiff points to two specific alleged DCSD customs or practices,

but does not argue that DCSD's inaction establishes <u>Monell</u> liability.

20

Specifically, Plaintiff contends that DCSD had a custom or practice of not notifying regional superintendents and principals about OLA reprimands, and further that DCSD did not properly maintain records on employee misconduct. In support, she relies primarily on the Deposition of Derek Carson. (Pl.'s Resp. to Def. DCSD's MSJ, Dkt. [70] at 14-15.) Plaintiff claims that Mr. Carson acknowledged that regional superintendents and principals do not typically receive OLA reprimands, and that there is no system-wide procedure for flagging employee misconduct. (Id.) DCSD objects to Plaintiff's characterization of Mr. Carson's deposition. Plaintiff also relies on Ms. Pringle's deposition as evidence that regional superintendents keep their own files. (Id. at 14.) While the Court is skeptical that this evidence alone is enough to establish a widespread custom or practice, even construing the evidence in Plaintiff's favor, Plaintiff still has not established Monell liability against DCSD.

Under Monell, establishing some sort of custom or practice is not the crux of the inquiry. Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997)("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality."). Importantly,

21

Plaintiff must show that the custom or practice was "the moving force [behind] the constitutional violation." Grech, 335 F.3d at 1330 (alteration in original) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989)). Further still, "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality."[5] See, e.g., Craig v. Floyd Cty., Ga., 643 F.3d 1306, 1311 (11th Cir. 2011) (finding no basis for Monell liability where inmate could not point to more than one incident where jail's alleged practice of not referring detainees to physicians led to an inability to help an inmate in need of medical attention); McDowell v. Brown, 392 F.3d 1283, 1290-91 (11th Cir. 2004) (finding no Monell liability where inmate pointed to one incident where jail's alleged under-staffing led to an inability to transport an inmate in need of medical attention).

Here, Plaintiff's proof of a custom or practice rests solely on DCSD's allegedly unconstitutional handling of the sexual harassment complaints

---

[5] One exception to this rule is if "proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985). This is the final policymaker theory of liability which the Court will address in the following section.

AO 72A
(Rev.8/82)

against Mr. Winston.  While it does appear that DCSD's internal record keeping for employee misconduct is not ideal, Plaintiff's only evidence that such sloppy record keeping caused unconstitutional harm is Mr. Winston's continued employment after the 2013 complaint.  Plaintiff does not point to any other situation, in Mr. Winston's case or others, where the alleged customs or practices led to any other unconstitutional mishandling of employee misconduct.  Instead, Plaintiff relies on "[p]roof of a single incident of unconstitutional activity," Tuttle, 471 U.S. at 823–24, which is "not sufficient to impose liability" against DCSD. Id. at 824.

Although unnecessary given the above analysis, the Court is skeptical that Plaintiff can establish a causal link between Mr. Winston's continued employment and either of the alleged customs or practices.  Plaintiff alleges that DCSD's internal customs or practices kept information regarding Mr. Winston's previous misconduct from decision-makers, which led to his continued employment, and ultimately violated M.W.'s constitutional rights. That said, it is undisputed that in her employee misconduct packet regarding the 2013 complaints Principal McGhee told then Regional Superintendent Pringle that this was the "second time" allegations of inappropriate conduct had

23

been made against Mr. Winston and noted that he is "continuously accused of inappropriate behavior." (Pl.'s SMF, Dkt. [72] ¶ 25.) Thus, Ms. Pringle had the information Plaintiff claims was stifled by DCSD's customs or practices and still failed to send the report to the OLA, resulting in Mr. Winston's continued employment. Given the above analysis, Plaintiff has failed to prove that DCSD had a custom or practice of constitutional violations at all, much less one that was "persistent," or "so widespread as to have the force of law." Connick v. Thompson, 563 U.S. 51 (2011).

The same analysis applies when considering a school board's failure to address employee misconduct, or custom of "inaction."[6] See Williams v. Fulton Cty. Sch. Dist., 181 F. Supp. 3d 1089, 1121 (N.D. Ga. 2016). For example in Broward, a source of arguments for both parties, especially Plaintiff, the Eleventh Circuit found that two complaints against one school employee were not enough to establish a custom because there was no persistent pattern of abuse. 604 F.3d at 1266. Examples of cases where such

---

[6] Because Plaintiff did not make this argument at the summary judgment stage the Court will not belabor the issue. However, it is important to note that Plaintiff cannot establish Monell liability under an "inactivity" theory either because she cannot establish a persistent pattern of abuse. See, e.g., Hackett v. Fulton Cnt. Sch. Dist., 238 F. Supp. 2d 1330, 1365 (N.D. Ga. 2002).

AO 72A
(Rev.8/82)

patterns have been found include a prison that received "at least thirteen complaints and inquiries" about prisoner abuse, <u>Valdes v. Crosby</u>, 450 F.3d 1231, 1244 (11th Cir. 2006), and a multi-year pattern of abuse by a teacher against several special education students with at least eighteen different reports, <u>Williams v. Fulton Cty. Sch. Dist.</u>, 181 F. Supp. 3d at 1121.

At most, DCSD made bad decisions around one isolated incident. While such an incident may be sufficient under Title IX analysis, it is not enough to impose <u>Monell</u> liability through a custom or practice. The requirement of a policy or custom "is intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action *for which the municipality is actually responsible*." <u>Grech</u>, 335 F.3d at 1329 n.5 (emphasis in original) (internal quotations and citations omitted). In situations concerning an isolated incident, plaintiffs can only establish <u>Monell</u> liability if the incident can be attributed to a final policymaker, as discussed below.

*2.  Municipal Official with Final Policymaking Authority*

The final policymaker theory of liability provides an avenue of <u>Monell</u> liability "for a single decision by municipal policymakers under

25

appropriate circumstances." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 1298 (1986). Here, Plaintiff claims that then Regional Superintendent Pringle and Principal McGhee were final policymakers. Accordingly, Plaintiff points to three decisions made by Ms. Pringle and Ms. McGhee as final policymakers for which DCSD can be held liable. Specifically, (1) Ms. Pringle's decisions not to report the 2013 complaint to the OLA, and (2) not to accept Ms. McGhee's recommendation to transfer Mr. Winston, as well as (3) Ms. McGhee's decision not to recommend termination. DCSD argues Regional Superintendent Pringle and Principal McGhee were not final policymakers. The Court agrees.

The first task in evaluating a single decision that led to a constitutional violation is to identify a final policymaker. "[W]hether a particular official has final policymaking authority is a question of state law." <u>Jett v. Dallas Indep. Sch. Dist.</u>, 91 U.S. 701, 737 (1989) (internal quotations omitted). The "identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the [court]." <u>Id.</u> In making this determination, the court must consider "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." <u>Id.</u>

26

The Eleventh Circuit has strictly "interpreted <u>Monell</u>'s policy or custom requirement to preclude [Section] 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decision making discretion to the subordinate, but retains the power to review the exercise of that discretion." <u>Scala</u>, 116 F.3d at 1399. A municipal official "does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." <u>Id.</u> at 1401.

Here, Plaintiff has not shown that Ms. McGhee and Ms. Pringle's decisions were not subject to meaningful administrative review. Beginning with Ms. McGhee, in her role as principal, Ms. McGhee had the authority to make recommendations to her superior, the regional superintendent. The regional superintendent was then free to accept or reject Ms. McGhee's recommendation. Like in <u>Broward</u>, this does not equate to final authority to make DCSD policy. 604 F.3d at 1265. In fact, perhaps the best example of Ms. McGhee's limited policymaking authority is precisely what Plaintiff points to as the decision at issue. Ms. McGhee recommended Mr. Winston's transfer and Ms. Pringle rejected her recommendation. Therefore, DCSD cannot be subject to <u>Monell</u> liability for the single acts of Principal McGhee.

AO 72A
(Rev.8/82)

Similarly, Ms. Pringle, in her role as regional superintendent, was not a final policymaker. Here, the regional superintendent had the authority to review the principal's employee misconduct packet and decide if the situation should be reported to the OLA. The regional superintendent did not have the authority to fire an employee, and Plaintiff does not allege that the superintendent did not have the authority to review the regional superintendent's decisions.

Instead, Plaintiff argues that Ms. Pringle is a final policymaker because her decision not to refer the 2013 complaint to the OLA was not subject to review. This argument, however, is no stronger than the argument that a principal is a final policymaker because his or her decision not to investigate a complaint is not subject to automatic review. The argument failed in <u>Broward</u> and again fails here. Ultimately, the superintendent had the authority to review Ms. Pringle's decisions. Just because the superintendent delegated some decision-making authority to subordinates, does not give the subordinates final policymaking authority. <u>See</u> <u>Scala</u>, 116 F.3d at 1403. Therefore, DCSD also cannot be subject to <u>Monell</u> liability for the single acts of Regional Superintendent Pringle.

Because the Court finds that Plaintiff has not met her burden on any

28

theory of <u>Monell</u> liability, Plaintiff's Section 1983 claim fails as a matter of law, and the Court need not address the merits of Plaintiff's Equal Protection claim or DCSD's objections on the merits. As such, Defendant DCSD's Motion for Summary Judgment [66-1] is **GRANTED** as to Plaintiff's Section 1983 claim.

**Conclusion**

For the foregoing reasons, Defendant DCSD's Motion for Summary Judgment [66-1] is **GRANTED in part and DENIED in part**. It is **GRANTED** as to Plaintiff's Section 1983 claim against DCSD. It is **DENIED** as to Plaintiff's Title IX claim. Therefore, this case will proceed on Plaintiff's Title IX claim against DCSD and Plaintiff's Section 1983 claim against Mr. Winston, as well as her derivative claims for punitive damages and attorney's fees. The parties shall submit a proposed consolidated pretrial order within 30 days of the entry of this Order. Trial will be scheduled by later order.

**SO ORDERED**, this 26th day of November, 2018.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)